Case number 19-3942, Dale Henceroth et al. v. Chesapeake Exploration, LLC, Oral Argument. Not to exceed 15 minutes per side. Mr. Sanders, for the appellants, you may proceed. Yes, this is Robert Sanders, counsel for the appellants, which are a class of oil and gas royalty owners. Appellants respectfully request five minutes of rebuttal time. This is a breach of contract action for the underpayment of oil and gas royalties by Chesapeake Exploration, LLC, which is the lessee on the leases at issue in this case. The district court granted Chesapeake's motion for summary judgment and denied the royalty owners' cross-motion for summary judgment. We submit that both of those rulings are incorrect. The leases provide for a monthly royalty of one-eighth of the revenue realized from the sale of the oil and the gas. The plaintiff's position, the appellant's position, is that Chesapeake failed to pay the royalty on the revenue realized. To understand this claim, it needs to be explained that Chesapeake takes the oil and gas to market in two steps. It first transfers title to the oil and gas to a marketing affiliate at the well. Counsel? The market, yes. Counsel, can I just, before you get into the Chesapeake subsidiaries, I'd just be curious as a matter of history how this has worked. Are these leases, where are they, about two decades old, or how old are they? These are fairly old leases. They were originally entered into by a gas producer called Anschutz Exploration. Just so you know, I don't want the whole history. I want one thing. How has the pricing worked under the leases in the past? Was it at the leasehold at the wellhead, or how did it work in the past? There were never royalties in the past. Anschutz sold the leases to Chesapeake, and Chesapeake, since the beginning of the royalty payments, has paid it on the wellhead price, not the downstream price. What happened under Anschutz? Didn't they sell it? No, they never started to produce under those wells. They simply signed up landowners, and then they sold the leases. They flipped the leases to Chesapeake without ever producing. The answer to my question is, has it been about 10 years? Chesapeake's been doing this approach? I think it's a little bit less than that. I think it's about seven or eight years they've been using this approach. I got it. Okay, so go back. Sorry, thank you. Thank you. Just to explain, there's a two-step process. Chesapeake transfers title at the well to a marketing affiliate. It has to transfer title because the marketing affiliate, in order to market the product, has to have title to move it through the interstate pipeline system. That's a FERC regulation, a federal regulation, that the shipper has to be the title holder. So Chesapeake Exploration unquestionably transfers title at the well, and it admits that it does. The marketing affiliate then processes the oil and gas and transports it to market and sells it to unaffiliated third-party buyers. We maintain that the only revenue realized is the price paid by the third-party buyers in the first arms-length transaction with an unaffiliated entity. The reason we say that's the case is the balance sheet of Chesapeake Exploration, which it refers to as a trial balance. The balance sheet reports as revenue to Chesapeake Exploration the full price paid by the third-party buyer in the downstream sale. That is clearly reported as its revenue. One of its witnesses, a Rule 30b-6 witness, testified that that amount that is reported as revenue is in fact revenue to Chesapeake Exploration, is in fact received by Chesapeake Exploration. Councilman, what do we do with the language from the leasehold? Doesn't that suggest that you do the pricing, quote, as it comes out of the earth from the leasehold? I don't believe there's any language that says at the leasehold. I thought it said from the leasehold. I thought that was part of the... No, it's one-eighth of the net revenue realized from the oil and gas marketed from the leasehold. But the gas is only marketed from the leasehold when it is marketed in the sale to the third-party buyers. So the marketed from the leasehold doesn't mean that the situs of the calculation is the leasehold. Why not? I'm just taking sold from the leasehold is how I'm interpreting it. Right, but we think at best that it would be ambiguous and must be construed against the drafter. But again, it has to be money that is realized. No money is realized at the leasehold. So in other words, there can't be a calculation of a leasehold price when no money is realized. The only cash, the only money that's paid and reported on the balance sheet is the gross price paid by the third-party buyer. There is no payment at the leasehold. One of the things that just seems... I'm not an expert in this area, but it just seems self-evident, is why is the price going up? And the only reason it seems to me the price could go up from at the wellhead to downstream is that some value has been added to it. And if some value has been added to it, that seems to suggest that the net back method is appropriate here and that it would be a windfall for the landowners. It's really not a windfall because the lease language requires that the royalty be paid on the amount realized. So the first step in the analysis is what was realized. Once one concludes, as I think one must by the balance sheet, that the revenue realized is the downstream price, then the question becomes what costs are properly deductible from the revenue realized. And under oil and gas law, the only costs that a gas producer can deduct from the revenue realized are costs that A, it incurs itself, and B, that are incurred while it still holds title. In this case, Chesapeake admits that the costs that were incurred between the well and the downstream sale were incurred by the marketing affiliate after Chesapeake exploration transferred title. Therefore, those costs are not properly deductible under settled oil and gas law. So again, it's a two-step analysis. First, what revenue was realized, and there was none realized at the well. Then one says, okay, we have the price that was realized. Now let's consider what costs, if any, are properly deductible. And under law, none of those costs are deductible. That's why the royalty must be one-eighth of the full amount realized in the sale to the third-party buyers. You acknowledged earlier that the language from the leasehold than marketed could be just sold from the leasehold, and your argument at that point to resolve the ambiguity veers into the accounting perspective of what did the balance sheet show. But I guess I would say there's another way to resolve the ambiguity, which doesn't turn on accounting. It turns on what the industry normally does. And I thought this net back method was pretty typical, and that seems to be suggested in the case law. The net back method is used frequently. There's no question about that, but it doesn't mean that it is always appropriate to use. Whether the net back method can be used depends upon two things. It depends on the lease language, and it depends on the manner, the factual manner, in which the oil and gas was marketed and sold. In this case, the lease language says it must be on money that is actually realized. There is no money realized at the well. Just a clarification. I know it sounds like a hostile question, but they often do if you're seeking clarification. But am I right in understanding your position that if you win the day after the ruling, a Chesapeake exploration could simply say, okay, let's just do the accounting at the wellhead. Here's what it costs, and then game over. So no change to the lease, but they just say it's a matter of accounting. Here's the price at that point. It would seem to me that under your subsidiary's accounting argument, that would be that. It's more than a matter of if they change where the payment was made, what money they received, then, of course, they could pay it on the net. I'm right. They could the next day, just between the subsidiaries, change the date of calculation and put it precisely in the books that way, and then you wouldn't be entitled to anything different from what you've been getting. I think that's almost correct. But the only clarification I would make is it's not just a bookkeeping matter. It's a matter of the receipt of money, of revenue that is paid. So if they changed how much money was paid, right now the gas producer, the defendant, is paid the gross price by the third parties. It's reported as its revenue. If they changed it the way Chesapeake says it happens, Chesapeake says the gross amount by the third party is paid to the marketing affiliate. I'm having trouble. Sorry? Oh, very good. Thank you very much. Thank you. Daniel Donovan for Chesapeake Exploration. May it please the court. I'd like to address three points this morning and to answer some of the questions that came up. And I think first is to reframe what is the issue, I believe, before the court, and that is did Chesapeake pay consistent with the lease language? And as Mr. Sanders was arguing, he didn't precisely get what the lease language is, and it is on page two of the district court's opinion. And what Chesapeake Exploration is obligated to pay is an amount equal to one-eighth of the net proceeds realized by the lessee from the sale of all gas and the constituents thereof produced and marketed from the leasehold. So a couple key points there. First of all, it's net proceeds realized by the lessee. Everyone agrees that the Chesapeake Exploration produced and marketed from the leasehold. Importantly, I heard Mr. Sanders argue about ambiguity. The parties agree, and the court found that the lease language is plain and unambiguous. There's no ambiguity. And the evidentiary record is clear that Chesapeake Exploration, the lessee, paid royalty owners one-eighth of the proceeds it received without any deductions. And that is why the district court found and granted summary judgment, and we believe it should be affirmed. Second point. How do you respond to the argument that, you know, these Chesapeake entities are all related, and he's kind of like saying the best evidence of what happens is what they do. And, in fact, he acknowledged. I took him to acknowledge if you want to change the way you do this, it would change the calculations, but it's your problem. You're the ones that did it this way. No, and we did it precisely right, and I want to answer that in two ways, Judge. First of all, there's no evidence, no argument that these entities were doing anything improper. Chesapeake Exploration didn't take any deductions. I don't think it's a propriety point. It's a you're hung by your own petard point. You know, you did it this way, and we're going to reap the benefit of how you did it. Yeah, but, Judge, this is what the district court found, and so did the Ohio Court of Appeals, is that what Mr. Sanders is arguing is just wrong because he's assuming that Chesapeake Exploration took deductions. It didn't. Let's do it the other way, and this is what we argue in our brief, is this is a net proceeds lease. So if you're going to collapse the entities, then the net proceeds, you get to the same answer. They paid the net proceeds, but what's important, and that's why both the Ohio Court of Appeals, the district court, and two arbitration panels have found that Chesapeake Exploration did it correctly. They received the net back. Everyone agrees that that's what they received. They didn't receive anything else. The testimony that Mr. Sanders, with all due respect, and he keeps inventing it because this is why the trial court, in her findings of fact, actually, page 10 says, quotes the testimony, and the lead testimony from the 30B6 says, is Chesapeake Exploration, that is the entity here, what are they paid? The answer is the net back price. Can you explain to people that aren't experts in the oil and gas business what it is that's actually done that adds value and would suggest there is a windfall to the property owners? Like what happens between wellhead and sale that is leading to a difference in price? I can't quite grasp that. Sure. So often in the oil and gas, the oil and gas is produced in an area where it's not really needed. It is produced in here. It's in somewhat rural Ohio, a lot of it on the east side. And what happens is it needs to get moved from the wellhead to an interconnect, which a lot of times is basically think of it as a collection point where a bunch of lines from these wells go. Sometimes that gas is sold there. And then sometimes it's moved even further, Cleveland, Cincinnati, Columbus, New York, for even a high risk. So it's solely transportation costs that you want to net out? Yes. It is one charge, and that's what's at dispute. And there's no doubt there would be a windfall because the whole point is this is net proceeds at the wellhead. That's the bargain that was struck. What Mr. Sanders is arguing – So just to make sure I'm getting all aspects of this, the oil leases have this clause that says free of cost. Is that referring to the cost of extraction? Is that what that means? That is, yes, production costs. These are what we refer to as post-production, once the mineral is severed from the ground. And the reason why the oil is different is a historic kind of quirk. Oil traditionally has been paid in kind. That is, you would actually get your share of the oil. Gas historically is paid with money or revenue realized. That's why when you read it, there's a difference. But in today's world, it ends up being the same analysis. But, yes, those are the production costs that actually to get it out of the ground, that's Chesapeake Exploration's job. They have to do it, and no one else's. So to get back, though, to the question that you asked, the problem is that either way that Chesapeake Exploration did it correctly, if you're going to respect the corporate formalities as the District Court, the Court of Appeals, and two arbitration panels did, this is all the District Court found. She looked at it and said, look, the evidence is simply one way. They don't take any deductions, and they give Mr. Sanders' clients one-eighth. Now, Mr. Sanders argues, well, wait, I want to collapse these entities for one purpose but not the other. Because remember, he's saying he's not disputing there was a transfer of title at the wellhead. There was. And under the Ohio UCC, the transfer of the title means it was a sale. And it was a sale. And the testimony, when you look at it in the record, is all uniform. What Mr. Sanders, and he's a good lawyer, but he's making arguments. He didn't put any evidence. There's no evidence that Chesapeake Exploration took deductions, that Chesapeake Exploration received anything other than the net back, that title wasn't transferred. What Mr. Sanders does is creates arguments to try to get at that downstream sales price. What's the case worth? Well, I mean, in terms of maybe per property owner, what does it come to in terms of what the approach, whether you do net back or not, amounts to for each property owner? The hard part there is it depends is it a huge chunk of property, or some of them are small family farms, so they have a small amount. So it really varies. But the windfall can be huge. The windfall can be huge. And what we believe the reason it's a windfall is because that's not the benefit that was struck. The benefit that was struck was the royalty owner would get the net proceeds that the lessee received from gas sold or oil sold from the leasehold. And that's exactly what's done. And that's why the Court of Appeals, and I think this is another reason you can affirm, is the Ohio Court of Appeals addressed the same thing. We submit this in a 28-J letter in the Gateway Royalty case. And there it's the exact same arguments. And I was counsel. Mr. Sanders was counsel. We argued the same case. And the Ohio Court of Appeals affirmed the same holding by the trial court. And I would refer to this court's church joint venture decision earlier this year where it held where an intermediate appellate court resolves a question of state law. That ruling is not to be disregarded by a federal court unless it's convinced by otherwise persuasive data that the highest court of the state would decide otherwise. Again, I think independently you should affirm. But I think that's another reason why, and Mr. Sanders hasn't given you any reason different, why the Ohio Court of Appeals that rejected his arguments that this wasn't a sale, this wasn't marketing, that Chesapeake Exploration received anything other than the net back price. Because the way this works is Chesapeake Exploration gets the money, gets the receivable, gets all the funds as a net back, and pays one-eighth without any deductions. And when we step back, that's exactly what the lease language requires. And that's why this court, excuse me, the district court, and the Ohio Court of Appeals, and two arbitration panels all on these same arguments with Mr. Sanders' defense counsel have affirmed and found that Chesapeake Exploration was paying directly and correctly with the lease and rejected Mr. Sanders' argument that somehow this wasn't a sale. And the reason it was a sale at the wellhead from Chesapeake Exploration to Chesapeake Marketing is the Ohio UCC, the Ohio Code 1302.01A11. That's what it provides. If a sale occurs in the passing of title, and you heard Mr. Sanders start his argument by saying title transferred at the well, and it did. The other undisputed fact, and I think Mr. Sanders would agree, Chesapeake Exploration did not incur any costs. They did not incur any costs. They didn't take any deductions. So then Mr. Sanders argues, well, I don't think that sale is a sale. But Ohio Code itself, and then what the Ohio Court of Appeals and the district court below said, well, the plaintiffs themselves cite the Merriam-Webster's Dictionary that says marketing is the same as selling. Then we go to what did the net back price and the gap accounting, and all the evidence is in one direction. The 30B6 testified that Chesapeake Exploration received the net back. The only accounting expert in the case, Mr. Goolsby, who Chesapeake put forward, said that is a value. That is a sale. And I understand Mr. Sanders arguing differently, but at the summary judgment stage, as this panel knows, you can't just put forward arguments. You have to put forth evidence, and he didn't. And that's why this court below the Ohio Court of Appeals and two arbitration panels found that way. So I come back to really, I think what this case, Gateway Royalty and the Ohio Court of Appeals was about is what does it mean in a lease when it says you are to pay one-eighth of the net proceeds realized by the lessee produced and marketed from the leasehold? And the record here establishes Chesapeake Exploration paid those one-eighth of the proceeds it received without any deductions. And I submit that is the beginning and the end of this case, just like the Ohio Court of Appeals found in Gateway Royalty, and ask that it be affirmed. Thank you, Your Honors. May I be heard in rebuttal? What did you say? You may proceed. Thank you very much. What Mr. Donovan has said is simply incorrect. The first thing that needs to be said is that the balance sheet was never produced in either of the two arbitration cases. Why is a mystery to me. It was responsive to document requests. In both of the court cases, the one at issue in this case and the Gateway case in the Ohio Court of Appeals, neither court even referenced the balance sheet, which reports as revenue to the defendant gas producer the gross amount paid by the third parties. That is the only money that was realized. And the 30B6 witness admitted it was paid and received. The gross amount was paid and received by the defendant gas producer. She admitted that. She also did say, as Mr. Donovan said, that the net was paid, but that is based on a mistake of law. She admitted and another 30B6 witness, an accountant at Chesapeake, admitted that the net amount is a receivable. And Mr. Donovan just admitted it's a receivable. The parent company, the parent over the gas producer and the marketing affiliate keeps a general accounting ledger, which shows debits and credits by and between the different subsidiaries. And the net price on which the royalty is paid is recorded on those ledgers, but it's recorded as a receivable. A receivable is money that is owed. In other words, the marketing affiliate on the books owes the gas producer defendant the net amount, but it's a debt. It's not a payment. The language of the lease says the royalty must be on revenue realized. That is revenue that is actually received and realized, not on money that is owed. So the testimony of the 30B6 witness that the net price is paid to the defendant by the affiliate is based on a mistake of law. She admits that her testimony is based solely on these general accounting ledgers. And Chesapeake admits in a brief at page 20 that the accounting ledgers show the net price is a receivable. It's an account receivable. They admit that. And under Ohio law, a receivable is not money that has been paid. It is money that has not yet been paid. So the only money paid was paid directly by the third-party buyers to the defendant and recorded as its revenue. Chesapeake has presented a false fact pattern that is simply refuted by the evidence. They say that the gross is paid to the marketing affiliate. The marketing affiliate deducts the post-production cost and pays the net to the gas producer. That's a fiction. The evidence is clear that the gross amount never goes to the marketing affiliate. It's paid directly to the defendant gas producer. And because that is the revenue realized, the royalty must be calculated on that amount. Now, it is true these are net revenue leases. That's clearly what the leases say. But there is this body of law that says when you have a net revenue lease, what costs are deductible from the gross revenue to determine the net on which the royalties will be paid? And a body of law has developed. It's not all costs. Oil and gas can pass from party to party to party to party until it eventually gets to the person who burns the gas. That doesn't mean that all costs in that long train of events is deductible from royalties. The courts have decided sensibly that the only cost deducted from the gross revenue realized to arrive at the net for royalty purposes, not for accounting purposes, they can account however they want what the net is, but for royalty calculation purposes, the only cost deductible from the gross to arrive at the net are costs that are both incurred by the lessee gas producer and incurred while the lessee gas producer still holds title. So Mr. Donovan can talk about the net proceeds language until the cows come home, but the fact of the matter is the net proceeds language doesn't magically mean that the cost between the well and the third party sale are deductible. And in this case, they are not under this fact pattern. Now, if in the future, as the court has pointed out, if Chesapeake actually received the net the way it says it does, if the third parties paid the gross to the affiliate, the affiliate deducted the costs and then paid over the net, then the net, the revenue realized would in fact be the net. And then the royalty should be one-eighth of the net. But that is not what factually occurred. The record is clear that the third party price goes directly to the defendant gas producer and no cost are deductible under settled oil and gas law. So we believe at a minimum the balance sheet and the testimony of the 30B6 witnesses generates a fact issue as to what revenue is realized. I believe your time is up. Thank you. We appreciate the argument both of you have given and we will consider the case carefully. Thank you. Thank you.